UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ESTATE OF TAMMY PEREZ by its administrator, SHERYL PEREZ, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:16-cv-00645-SEB-DML |
| MORGAN COUNTY SHERIFF, ADVANCED CORRECTIONAL HEALTHCARE, INC., ANITA BURNAM, RACHEL MUNDY, CHRISTINA ANDERSON, BOBBIE ANTHIS, MALLORY SCHWAB, ERIC MULLIKIN, VIENNA MARTIN, JARED SMITH, KRIS DARLING, ROBERT ANDREWS, DR. RONALD EVERSON, BRIGHTON SICHTING, ANDREW MOORE, NICHOLAS SMITH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM ORDER
ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. 84) AND
PARTIAL SUMMARY JUDGMENT (DKT. 87)**

Tammy Perez ("Tammy") died on October 1, 2015, after three days' confinement

in the Morgan County jail ("the Jail"). Plaintiff, Tammy's estate ("the Estate"), by her

mother Sheryl Perez ("Sheryl") in her capacity as personal representative of the Estate,

sued defendants Morgan County Sheriff in his official capacity[1] ("the Sheriff"),

Advanced Correctional Healthcare, Inc. ("ACH"), the Jail's private healthcare contractor,

one Jail doctor,[2] two Jail nurses,[3] four Jail medical officers,[4] and seven Jail officers[5]

under 42 U.S.C. § 1983 for violations of the Eighth Amendment and state-law

negligence.

Now before the Court are the *Motion for Summary Judgment*, Dkt. 84, filed by the

Sheriff, the Jail nurses, the Jail medical officers, and the Jail officers (together, "the

Morgan County Defendants"), and the *Motion for Partial Summary Judgment*, Dkt. 87,

filed by ACH and the Jail doctor (together, "the ACH Defendants"), seeking judgment on

the Estate's federal claims only.

The Estate concedes that, of the Morgan County Defendants, two Jail medical

officers[6] and four Jail officers[7] are entitled to judgment in their favor. Pl.'s Resp. Br.

---

[1] Though the Estate's papers do not use the phrase "official capacity," its Second Amended Complaint makes clear that it does not seek to hold the Sheriff personally liable. Pl.'s Second Am. Compl. (Dkt 54) ¶ 6 ("Defendant Morgan County Sheriff is a law enforcement agency . . . and a political subdivision of the state of Indiana."). The Estate's arguments on summary judgment are consistent with this posture.

[2] Dr. Ronald Everson ("Dr. Everson").

[3] Anita Burnam ("Nurse Burnam") and Rachel Mundy ("Nurse Mundy").

[4] Christina Anderson ("Anderson"), Andrew Moore ("Moore"), Brighton Sichting ("Sichting"), and Nicholas Smith ("N. Smith").

[5] Robert Andrews ("Andrews"), Bobbie Anthis ("Anthis"), Kris Darling ("Darling"), Vienna Martin ("Martin"), Eric Mullikin ("Mullikin"), Mallory Schwab ("Schwab"), and Jared Smith ("J. Smith").

[6] Sichting and N. Smith.

[7] Andrews, Darling, Martin, and Mullikin.

Opp. Mots. Summ. J. (Dkt. 97) 2–3.[8] The Morgan County Defendants' motion is therefore granted as to those defendants without further discussion. For the reasons below, as to the remaining Morgan County Defendants, their motion is granted in part and denied in part. The ACH Defendants' motion is granted in part and denied in part. The bases for these rulings are explicated below.

**Facts and Procedural History**

We state the facts and the inferences from them in the light most favorable to the nonmovant, the Estate. The following account is therefore necessarily one-sided. "We do not vouch for the objective truth of every detail of the following account [n]or take any position as to [the Estate]'s ultimate chance of success on the merits." *Berry v. Peterman*, 604 F.3d 435, 438 (7th Cir. 2010).

**I. Tammy's Background: August 11, 1981, to September 27, 2015**

Tammy was born on August 11, 1981, with "congenital adrenal hyperplasia due to adrenal steroid 21-hydroxylase deficiency[,]" Dkt. 96 Ex. 2 (Schnall Rep.), at 2, "the most common form of congenital adrenal hyperplasia." *Id.* at 4. Deficiency of 21-hydroxylase depresses the production of certain critical steroids by the adrenal glands. In Tammy's case, this steroid imbalance during prenatal development meant "[s]he was a girl getting more male hormone, so when she was born, her private area was not as it should have looked." Dkt. 86 Ex. 1 (Sheryl Dep.) 42:3–5. As a result, Tammy had "maybe 10" genital reconstruction surgeries during her life. *Id.* at 42:14.

---

[8] Record citations refer to the CM/ECF pagination except as to deposition transcripts, which are cited according to their internal pagination.

Also as a result of her adrenal hyperplasia, Tammy "required daily hormone replacement therapy to prevent cardiovascular collapse/arrest." Dkt. 96 Ex. 4 (Sozio Rep.), at 2. More specifically, adrenal hyperplasia due to 21-hydroxylase deficiency

> may occur in a 'classical' or 'non-classical' form. The majority of patients with the classical form become very ill within 24 to 48 hours if deprived of their steroid replacement medication . . . , and develop severe dehydration and electrolyte imbalances, often resulting in death. Patients with the non-classical form . . . can often tolerate being off steroid replacement medication for several days without any serious medical consequences, as long as they are not under any abnormal physical stress. Physical stress causes the body to need higher than normal amounts of adrenal steroids.

Dkt. 96 Ex. 2 (Schnall Rep.), at 4. The adrenal glands of adrenal hyperplasiacs "who have taken adrenal steroids chronically . . . lose the ability to automatically produce" the higher steroid levels required by the body under stressful conditions, *id.*, requiring "double or triple" the ordinary dose of replacement steroid. Dkt. 96 Ex. 6 (Gavin Dep.) 17:12. The classical form may be further divided into "salt-wasting" and "non-salt-wasting" forms, of which the salt-wasting form is the more severe, *id.* at 35:4–6, apparently depending on whether the patient's adrenal insufficiency requires replacement of both aldosterone and cortisol, in the salt-wasting form, or of cortisol only, in the non-salt-wasting form. *See* Dkt. 96 Ex. 3 (Schnall Dep.) 27:1–28:23.

Tammy appears to have had classical adrenal hyperplasia, which may have transitioned in her youth or early adulthood from the salt-wasting to the non-salt-wasting form. *Id.* at 27:9–14. For her steroid replacement therapy, "[d]uring [Tammy's] late teen-age years her primary adrenal steroid medication was changed from hydrocortisone to

dexamethasone . . . [,]" Dkt. 96 Ex. 2 (Schnall Rep.), at 2, and Tammy remained on

dexamethasone until her death. Tammy and Sheryl "were advised by [Tammy's]

endocrinologists that she could die of adrenal crisis if her steroid replacement was not

maintained adequately." *Id.* Sheryl was convinced of the importance of Tammy's

dexamethasone and ensured that Tammy took it regularly, even after Tammy had moved

out of Sheryl's house at age 18. Tammy kept her dexamethasone at home and in her

purse, and Sheryl would keep a few pills from each prescription refill at her own house,

in case Tammy needed them there.

Tammy also suffered from fibromyalgia and arthritis in her back and hands, and

"always told [Sheryl] her whole body hurt[]." Dkt. 86 Ex. 1 (Sheryl Dep.) 109:1–2. By

2010, while living in Bloomfield or Bloomington, Indiana, Tammy was seeking pain

treatment from a doctor in Terre Haute, Indiana, who "pushed pills." *Id.* at 79:22. In

2011, she reported that "[n]othing [took] [her] pain away. Taking [her] meds help[ed] and

taking hot baths sometimes." *Id.* at 87:11–12. Tammy would often take hot baths or hot

showers to alleviate pain and discomfort. By 2013, Tammy was "taking opiates

chronically for back pain." *Id.* at 99:18. Around the same time, Sheryl began to suspect

that Tammy was a "chronic substance abuser[.]" *Id.* at 78:9–11. Eventually Tammy

admitted to Sheryl to using heroin.

Sheryl saw Tammy suffer from heroin withdrawal "[m]aybe twelve times." *Id.* at

96:25. Sheryl went with Tammy to the hospital for Tammy's withdrawal "maybe six or

seven times." *Id.* at 96:19. Sheryl observed that Tammy's withdrawals appeared to have

"different levels." *Id.* at 97:22. At their mildest, Tammy's withdrawals caused her to feel

"sick" and "irritable . . . ." *Id.* at 98:1. At their severest, Tammy would "throw[] up and couldn't get it to stop." *Id.* at 98:7–8. "If [Tammy's vomiting] continued for maybe three or four hours and [Sheryl] couldn't get her to stop[,]" Sheryl would take Tammy to the hospital. *Id.* at 98:11–12. For that reason, Sheryl never saw Tammy go through severe withdrawal for more than one day. *Id.* at 169:13–14. Sheryl and Tammy understood that Tammy was supposed to "double up on her [d]examethasone" when Tammy's vomiting was severe, *id.* at 105:18–23, and Tammy's ability to keep the medication down during these episodes "was always [Sheryl's] main concern." *Id.* at 108:21. When Tammy was treated by emergency room doctors at her hospital visits for severe vomiting and nausea, they "treated her with either IV fluids or with anti-nausea medication in an other-than-oral route." Dkt. 96 Ex. 3 (Schnall Dep.) 44:18–20. In at least one instance, Tammy was given her dexamethasone intravenously as well. The hospitals' treatment of Tammy was thus "effective for dehydration and adrenal insufficiency, in every instance" for which there is record evidence. *Id.* at 47:21–22.

On March 7, 2015, Tammy was arrested for possession of a narcotic drug and three related offenses, and, after three days in the Jail, was released pending trial. She agreed to plead guilty to the possession charge in exchange for dismissal of the balance. Tammy's case was set for a sentencing hearing on September 28, 2015. The night before, September 27, 2015, Tammy used heroin for the last time, expecting, on the advice of her lawyer, to be sentenced to home detention rather than incarceration.

## II. Tammy's First Day in Jail: September 28, 2015

On the morning of Monday, September 28, 2015, Morgan Superior Court imposed a 547-day sentence on Tammy, 90 days executed and 457 days suspended to probation. The abstract of judgment noted that Tammy's "[e]xecuted time may be spent in in patient [*sic*] treatment facility upon admission[.]" Dkt. 86 Ex. 1 (Sheryl Dep. Ex. 44), at 35. As Tammy's incarceration was unexpected, neither Sheryl nor Tammy had brought Tammy's medication to the sentencing hearing. Once Tammy had been remanded to the Sheriff's custody, Sheryl went to Tammy's house and picked up her medications, including her dexamethasone. Sheryl brought them to the Jail before noon and asked to speak with a nurse or a doctor.

Sheryl spoke with Anderson, the on-duty Jail medical officer,[9] and Nurse Burnam, the on-duty Jail nurse. At the time, Anderson worked the Jail's day shift, from 8:00 a.m. to 4:00 p.m., on weekdays, and Nurse Burnam worked a similar shift, weekdays from 8:00 a.m. to 4:00 p.m., or from 9:00 a.m. to 5:00 p.m. Sheryl had brought four medications for Tammy and delivered them to Nurse Burnam. Sheryl made clear to Nurse Burnam that she "didn't care if [Nurse Burnam] gave [Tammy] the other[s] . . . ," but that Tammy "had to have [the dexamethasone] every single day." Dkt. 86 Ex. 1

---

[9] A medical officer at the Jail was not a nurse or other healthcare professional, but

> basically assisted the [on-duty] nurse in her duties. [A medical
> officer] would take vitals. If a medical situation arose and [the
> officer] knew about it, [the officer] was to take it to [the on-duty
> nurse]. If there was no nurse there, then [the officer] was to do the
> vital signs with another officer present, go through the protocol,
> call the doctor and then follow the doctor's orders from there.

Dkt. 86 Ex. 10 (Anderson Dep.) 7:4–10. A medical officer going off duty was to report any inmate medical issues to the next shift's medical officer.

(Sheryl Dep.) 185:21–24. Nurse Burnam acknowledged Sheryl's directive and "assured [her] that they knew that [Tammy] had to have that medicine." *Id.* at 187:1–2. Sheryl "went into detail about what the issue was" that necessitated the dexamethasone, though Anderson could not later recall "that [Tammy's having an adrenal gland disorder] was exactly what it was." Dkt. 86 Ex. 10 (Anderson Dep.) 9:22–24.

Anderson then called Dr. Everson, the Jail doctor, who was not on duty at the Jail that day, and requested approval to administer the four medications to Tammy. Dr. Everson approved three of the medications, including the dexamethasone, but not the fourth, mirtazapine, "a mental health medication, usually . . . used to treat depression, sometimes . . . used . . . as a sleeping pill." Dkt. 86 Ex. 5 (Everson Dep.) 45:7–9. Anderson began a Medication Administration Record ("MAR") "that would document when Tammy . . . would receive scheduled medication in the [Jail]." Dkt. 86 Ex. 8 (Burnam Aff.) ¶ 4.

Around 10:00 a.m., September 28, 2015, Martin, a Jail officer, recorded an assessment of Tammy. Martin noted that Tammy "appear[ed] to be under the influence of heroin" and admitted using heroin the night before. Dkt. 86 Ex. 6 (Mundy Dep.) 48:18– 19. Tammy also admitted to Martin that she was dependent on heroin, which Martin recorded. Martin recorded further that Tammy reported taking two medications, dexamethasone and Suboxone, a drug used to treat opioid addiction, though Suboxone was not among the medications Sheryl had delivered to the Jail for Tammy.

After Martin completed Tammy's book-in procedure, Tammy was placed in cell R2, a cell near the Jail's receiving area known as the women's "drunk tank." Dkt. 86 Ex. 12 (Martin Dep.) 8:9–16, 11:9–23.

## III. Tammy's Second Day in Jail: September 29, 2015

Around 4:30 a.m., Tuesday, September 29, 2015, Tammy called Sheryl for Tammy's Jail-allotted twelve-second phone call. Tammy asked Sheryl to pick up her Suboxone prescription. Sheryl asked, "What about rehab?" Dkt. 86 Ex. 1 (Sheryl Dep.) 38:22. Tammy told Sheryl not to worry and that Tammy would "take care of it in here." *Id.* at 38:24. Tammy sounded "[g]roggy, like somebody that just, you know, woke up, wasn't feeling well." *Id.* at 39:20–21. It would be the last time Sheryl spoke with her daughter.

Around 8:00 a.m., Nurse Burnam administered Tammy's dexamethasone orally.

Between 2:00 p.m. and 3:00 p.m., Stacey McLaughlin ("McLaughlin") was booked into the Jail. As her book-in procedure was completed in the Jail's receiving area, McLaughlin "could hear [Tammy] retching from the outside[;] [McLaughlin] could hear [Tammy] being violently ill when [McLaughlin] was outside when [she] had just arrived there. . . . And [McLaughlin] could hear someone being violently ill over and over again and then [the Jail officers] moved [McLaughlin] into that cell [R2]." Dkt. 96 Ex. 8 (McLaughlin Dep.) 14:25–15:5. When McLaughlin entered the cell, "Tammy was somewhat coherent . . . ." *Id.* at 14:24. But "[w]ithin an hour she was incoherent, [and] could not talk anymore." *Id.* at 15:6–7.

Tammy "was too sick" to make any introductions. *Id.* at 23:9. "[S]he mumbled and said something like she was really ill . . . ." *Id.* at 23:9–10. McLaughlin found it difficult to concentrate on Tammy's plight at first because McLaughlin was "a little disgusted" that she had been put into a cell with "vomit on the wall" and a person who "c[ould]n't get up to vomit into . . . the toilet . . . in very close quarters." *Id.* at 23:5–6, 23:1, 23:4–5.

Throughout the afternoon, prior to the inmates' supper being served, as observed by McLaughlin and her fellow inmate in R2 Michelle Rose ("Rose"), Tammy continued to deteriorate:

> [Tammy] just was getting sicker. She wasn't talking as much.
> The vomiting was really bad. She would knock on the door,
> we would knock on the door saying she needed help. At one
> point it was a mess. I mean there was vomit on the walls,
> there was vomit on the floor, there was vomit on the mats,
> you know, and we are all exposed to this. . . . [I]t was very
> apparent this young woman needed to go to the hospital . . . .

*Id.* at 25:2–13.

Around 4:50 p.m., Tammy was examined by Nurse Burnam. Tammy complained to Nurse Burnam of suffering from heroin withdrawal. Specifically, Tammy's "subjective complaint was heroin withdrawal and she had been vomiting for . . . one to two hours[.]" Dkt. 86 Ex. 5 (Everson Dep.) 34:11–13. Nurse Burnam recorded her objective assessment of Tammy as follows: "stomach hurts, diarrhea, slightly dehydrated, skin clammy, mostly dry heaves, small amount of yellow stomach bile present." *Id.* at 34:16–18. Nurse Burnam assessed Tammy's dehydration by a skin turgor test, that is, Nurse Burnam "pulled the skin up on [Tammy's] hand and it was a little slow going down." Dkt. 86 Ex.

4 (Burnam Dep.) 13:22–23. Tammy's blood pressure was 118/78; her pulse was 82 beats per minute; and her temperature was 97.6 degrees Fahrenheit.

Nurse Burnam, who, as a nurse, was not authorized to prescribe medications, called Dr. Everson, who was not at the Jail that day, and reported her findings and assessment. Dr. Everson agreed that Tammy was suffering from heroin withdrawal and ordered a "withdrawal protocol, which consisted of a one time dose of [P]henergan and administrations of [V]istaril and [B]entyl, twice a day for five days." Dkt. 86 Ex. 1 (Burnam Aff.) ¶ 6. Those medications, among other effects, "help[] with nausea, vomiting, diarrhea[,]" Dkt. 86 Ex. 6 (Mundy Dep.) 26:1, and were pills to be taken orally. Nurse Burnam recorded that any follow-up was to be at the "inmate's request[,]" or, in other words, "[i]f Tammy felt like she was getting worse, she was to let [Jail staff] know." Dkt. 86 Ex. 4 (Burnam Dep.) 14:16, 14:21–22. There was no "plan to determine whether once [Tammy] took [the withdrawal protocol medications] and . . . if she was still vomiting whether she would be able to keep [the medications] down[,]" *id.* at 15:11–14, though Nurse Burnam understood that the medications would not have had "any [e]ffect" on Tammy if she were unable to keep them down. *Id.* at 15:16.

After Nurse Burnam examined Tammy and the inmates had their supper (excepting Tammy, who did not eat), Tammy's deterioration progressed rapidly:

> Let me tell you something, I have never seen so much fluid leave a body in my life. I don't want to get teary-eyed. I have never seen anything like this. . . . They gave [Tammy] a drink of water and she vomited. I mean a sip. And when she vomited up, I mean they gave her a sip of water and she would vomit up that much.

> We were beating on the doors because she couldn't make it to
> the trash can so then they brought her this sack. They
> probably carried out four or five of those bags. And they
> looked like giant colostomy bags when they were leaving.
> They gave her medicine and we told them you can't give her
> pills, she throws them up immediately. . . .
>
> But they did let her out at one point because she lost control
> of her bowels and she was laying down at one point and she
> said, "Oh, no," and she knew that she had lost control of her
> bowels so she started beating on the door. . . . [I]t was very
> apparent this young woman needed to go to the hospital and
> we told them that [after dinner].

Dkt. 96 Ex. 8 (McLaughlin Dep.) 23:20–24:16.

By 8:00 p.m., Nurse Mundy, the Jail nurse who worked the evening shift, which

lasted from approximately 4:00 p.m. or 5:00 p.m. until approximately midnight (though

Nurse Mundy usually left around 10:00 p.m.), had relieved Nurse Burnam. Around 8:00

p.m., Nurse Mundy delivered Tammy's Vistaril and Bentyl:

> [After dinner there was a medical pass] and they gave her a
> pill. . . . And she immediately vomited it up. And at that point
> we even told them she needs—I think at that point the first
> medical pass, we told them she needed to go to the hospital
> because she was getting dehydrated and that she could not
> keep anything down. . . .
>
> What [Jail staff] do is you pound on the door again and say is
> [medical staff]—are they coming, and they say, yeah, we let
> them know and then maybe an hour later someone might
> come, or they may not.
>
> [But] they came for the medical pass. And I am going to tell
> you, the nurse person [Nurse Mundy] was very insensitive,
> she was rude. She was like drink lots of fluid, here is some
> Pepto Bismol, . . . and she was very rude. . . .
>
> [S]he was exasperated and was like here is Pepto Bismol,
> here is some water type thing.

*Id.* at 26:13–21, 29:8–17, 32:23–25. Nurse Mundy later delivered Tammy's Phenergan,

though that delivery was not recorded on Tammy's MAR:

> Later [Nurse Mundy] came [for a second medical pass] and
> she may have given her I think it was Phenergan. I don't
> know what it was, but it was in a pill form. [Tammy] threw it
> up. [Nurse Mundy] came again because we pounded on the
> doors and we tried to explain to her [that Tammy] needs to go
> to the hospital and get a shot, she is throwing everything up, it
> is doing no good. We told them—told [Nurse Mundy that
> Tammy] can't even hold down a sip of water. If anything
> touched her lips, a gallon of something came out. . . .

> [T]here is no compassion when someone is going through
> withdrawal. . . . [Nurse Mundy] was just being rude. . . . You
> can be professional and you can be compassionate. It doesn't
> mean you have to stroke their head or anything, but you can
> be professional and you can be neutral, but you can at one
> point just talk like someone is not a very nice person and
> doesn't really deserve any treatment or help and that's how
> [Nurse Mundy] addressed [Tammy]. . . . It was worse than
> cold. Cold I understand. Cold is like trying to remove
> yourself from the situation because it might bother you or,
> you know, you just don't care. It was beyond that. It was
> disdain. That's the best way I can describe it, disdain.

*Id.* at 32:25–33:8, 33:21–22, 34:2–10, 34:15–20.

## IV. Tammy's Third Day in Jail: September 30, 2015

As Tuesday, September 29, 2015, passed into Wednesday, September 30, 2015,

Tammy's condition continued to worsen:

> Throughout—I mean, throughout the night later perhaps is
> when she started, and it may have been early in the morning,
> like I said, you lose time in [the Jail]. I mean she was getting
> sicker and sicker. She moved to the floor by this time. I am
> pretty sure she was lying on the floor. . . . [I]t is all a blur at
> this point, but [Tammy] was getting more ill, she was
> becoming more incoherent, but I could tell you at certain
> points she was lying on the floor, she beat on the floor and
> said, "Help me, help me." She was lying on the floor saying,

"Help me, please. Help me. She was begging for help . . .
loud enough that they could have heard her.

*Id.* at 36:11–37:1. At some point Tammy abandoned her efforts to vomit into a trash can

or toilet and began to "just turn[] her head . . . ." *Id.* at 38:24. "[A]ll of a sudden

[McLaughlin] heard [Tammy] go, 'Oh, shit.' . . . [A]nd she said, 'I shit myself.' And she

was really embarrassed and . . . that is the first time she started pounding on the door . . .

asking to be cleaned up." *Id.* at 39:13–17.

Schwab and J. Smith were Jail officers on the Jail's night shift, which lasted from

approximately 12:00 a.m. to approximately 8:00 a.m. J. Smith was the shift supervisor

and Schwab's superior. No nurses or doctors were on duty at the Jail during the night

shift.

As reported by McLaughlin, "[a]t the point that [Tammy] started losing control of

her bowels, [Schwab] was nice enough to take her out, let her take a shower." *Id.* at 37:5–

6. In fact, Tammy was allowed two showers over the course of the night shift. As Rose

observed, "Tammy [had] los[t] control of her bodily functions and . . . repeatedly soil[ed]

herself and her clothing with her own vomit and feces." Dkt. 96 Ex. 9 (Rose Aff.) ¶ 12.

And Tammy "not only soiled herself and her clothes, but also the cell area we shared."

*Id.* ¶ 13. Accordingly, Schwab "removed Tammy from her cell, took her to the shower so

she could wash the vomit and feces off . . . [,] and returned her to the cell." *Id.* ¶ 14. But

"[t]hese measures only worked temporarily, as Tammy's nausea and diarrhea were so bad

that she quickly soiled her jail clothing." *Id.* ¶ 15.

During Tammy's showers, Schwab observed Tammy "sitting down in the shower just letting the water run over her after she cleaned herself, . . . sitting there leaning against the wall." Dkt. 86 Ex. 11 (Schwab Dep.) 12:16–17, 12:21. Eventually Schwab and J. Smith grew "a little exasperated . . . and that's when they said this is the last time, we can't do this again, you need to make it to the toilet." Dkt. 96 Ex. 8 (McLaughlin Dep.) 40:7–10. "Try to make it to the toilet, you're an adult," Schwab told Tammy. Dkt. 86 Ex. 11 (Schwab Dep.) 12:3. But Tammy could not, and "it happened again throughout the middle of the night but no one let her clean herself up that time." Dkt. 96 Ex. 8 (McLaughlin Dep.) 40:10–13.

Tammy was "left . . . in her cell for hours in jail clothing drenched in her own vomit and feces." Dkt. 96 Ex. 9 (Rose Aff.) ¶ 16. During this time, Tammy was "throwing up constantly, her eyes [were] starting to sink back into her head, she look[ed] like she ha[d] lost 20 pounds, it [was] very apparent. She [was] mumbling, she [could] barely speak at this point . . . ." Dkt. 96 Ex. 8 (McLaughlin Dep.) 40:22–41:1.

Around 4:30 a.m., Tammy tried to call Sheryl again, as she had the day before. But "you've got to go in there and pay money to have your phone set up to receive phone calls [from the Jail], and [Sheryl] hadn't done that." Dkt. 86 Ex. 1 (Sheryl Dep.) 40:18–21. Sheryl went to have her phone set up that same day, but would not receive another phone call from Tammy.

 Around 8:00 a.m., Nurse Burnam administered Tammy's dexamethasone, Vistaril, and Bentyl orally. Around the same time, Tammy's fellow inmates "told [Jail

staff] you are giving [Tammy] medicine and it is doing no good because she throws it up." Dkt. 96 Ex. 8 (McLaughlin Dep.) 49:3–5. Tammy did not eat breakfast.

Between 9:00 a.m. and 10:00 a.m., now the Jail's day shift, on-duty Jail officers removed Tammy from her cell for another shower. This would be the last McLaughlin and Rose would see of Tammy. "[A]t this point, [Tammy] looked really, really bad. . . . That's when her eyes were sunken down in the back of her head, everything." *Id.* at 49:13–16. Tammy's vomiting and diarrhea had continued unabated. Such was Tammy's distress that "when she took a drink of water, she would vomit a little bit and then she would spit it out and then she would take in her cup and then she take another drink of water." *Id.* at 43:21–24 (*sic passim*). McLaughlin was horrified and disgusted. The volume of Tammy's vomiting and diarrhea made McLaughlin shocked to learn "the human body had that much fluid in it . . . ." *Id.* at 50:17. Tammy was "white as a ghost[,]" *id.* at 50:25, looking "so dehydrated that [McLaughlin thought] she was going to have a heart attack." *Id.* at 65:17–18.

At various times over the past day, McLaughlin and Rose had seen and heard Tammy beg the Jail staff to go to the hospital, and had told Jail staff the same. They had both observed Tammy's inability to keep down any of the medications she was given and had both informed Jail staff of this inability. They had both observed Tammy repeatedly soiling herself with vomit and feces. It was obvious to both women that Tammy's treatment by the Jail was not effective.

When Tammy finished the shower she had been given between 9:00 a.m. and 10:00 a.m. that morning, she was "in a weak state," Dkt. 86 Ex. 13 (Mullikin Dep.) 6:25,

asked for help, and slid or fell to the floor. The officers attending to Tammy as she showered determined that she needed medical attention and procured a wheelchair. The officers put Tammy in the wheelchair and transported her to the medical section of the Jail, with "probably . . . some sort of explanation of why she came to that area." *Id.* at 9:13–14.

In the medical section, Anderson was the on-duty medical officer and Nurse Burnam was the on-duty nurse. It was the day of Dr. Everson's weekly visit to the Jail, on which days Dr. Everson would spend on average between one and one-half to two hours there. Nurse Burnam examined Tammy first, around 11:00 a.m., recording as her subjective complaints, "Believes she is dehydrated[;] [s]till vomiting." Dkt. 86 Ex. 8 (Burnam Aff. Ex. 3), at 9. Nurse Burnam "thought she was a little bit [dehydrated] like with the skin on her hand[.]" Dkt. 96 Ex. 13 (Burnam Dep.) 17:18–19. Tammy's blood pressure was 101/68 (compared to 118/78 the day before); her pulse was 106 beats per minute (compared to 82 beats per minute the day before); and her temperature was 97.5 degrees Fahrenheit (compared to 97.6 degrees Fahrenheit the day before). Anderson thought Tammy "was a little upset[.]" Dkt. 96 Ex. 12 (Anderson Dep.) 13:7.

Around 12:30 p.m., Dr. Everson examined Tammy. Dr. Everson determined that Tammy was "alert and oriented . . . to person, place and time" and "[i]n no acute distress[.]" Her mucus membranes (that is, the inside of her mouth) were "moist," leading Dr. Everson to conclude that Tammy was not dehydrated; her "heart ha[d] regular rate and rhythm" and her "skin [wa]s warm." Dkt. 86 Ex. 5 (Everson Dep.) 32:1–4. Dr. Everson diagnosed Tammy with heroin withdrawal. According to Dr. Everson,

> [Tammy] was presumed to be having symptoms of heroin
> withdrawal and that was manifested by nausea and vomiting,
> and I was evaluating her for those problems. . . . She was
> obviously not feeling well, feeling sick, as people with heroin
> withdrawal always do. She sat up on the bed and talked to me
> and I evaluated her. Her mental status seemed normal to me,
> and we talked for a moment. I don't recall what was said
> specifically, just, you know, asked her how she was feeling
> and rechecked her vital signs myself. . . . In talking to her I
> established that her mental status seemed intact and her vital
> signs were stable at the time, so I decided to continue to
> monitor her for any signs of cardio-vascular instability[.]

*Id.* at 14:24–15:2, 15:11–17, 17:1–5.

Dr. Everson ordered that Tammy's vital signs should be checked once per shift, that is, every eight hours. Further, Dr. Everson judged that Bentyl was "primarily effective for diarrhea[,]" so he "decided to switch her to Phenergan, which is . . . more effective on vomiting in particular, nausea and vomiting." *Id.* at 17:10–13. (Tammy had also been given Phenergan the day before, but that had been ordered only as a one-time dose.) Otherwise, Dr. Everson continued Tammy on her previous medications, Vistaril and dexamethasone, at the same dosages. Dexamethasone has several therapeutic uses in addition to steroid replacement in adrenal hyperplasiacs, "treat[ing] poison ivy . . . ," *id.* at 11:16, for example, but Dr. Everson did not know why Tammy was on dexamethasone, did not inquire why, and was not told why by Nurse Burnam or Anderson, who had been told by Sheryl on September 28, 2015. Anderson thought it was "possible" that Tammy asked Dr. Everson to be taken to the hospital, Dkt. 96 Ex. 12 (Anderson Dep.) 12:24, but she did recall Dr. Everson "making the decision not to send" Tammy there. *Id.* at 13:1–2.

Jail staff decided not to return Tammy to cell R2 in the Jail's receiving area. Instead, she was placed by herself in a cell in the medical section. "There was vomit on the floor [of the medical cell] at one point . . . [,]" *id.* at 17:17–18, as Nurse Burnam heard Tammy vomit "once or twice" and found vomit on the floor of her cell, which Nurse Burnam checked for medications. Dkt. 86 Ex. 4 (Burnam Dep.) 10:1. Tammy was given a shower around 3:00 p.m. As the day shift passed into the evening shift, Nurse Burnam was relieved by Nurse Mundy and Anderson was relieved by a different medical officer.

When Nurse Mundy "saw the inmate on the 30th, she had a trash can in her cell and she had been spitting up stomach bile[;] she had not vomited[,]" by which Nurse Mundy meant that Tammy had not vomited any "solid food[.]" Dkt. 96 Ex. 17 (Mundy Dep.) 42:16–18, 43:3. "[M]ore of a dry heave," Nurse Mundy thought. *Id.* at 43:25. Tammy had begun pouring "room temperature" water from the faucet in the medical cell onto her legs; "the inmate had been saying that she was cold . . . ." Dkt. 86 Ex. 6 (Mundy Dep.) 18:6, 17:7–8. For this reason, though "it's possible" it was also because Tammy's Jail clothes were soiled, *id.* at 17:21, Nurse Mundy and a Jail officer allowed Tammy to take another shower.

Around 8:00 p.m., the on-duty medical officer dispensed Tammy's evening medications. Around the same time, Nurse Mundy took Tammy's vital signs. Tammy's blood pressure was 98/68 (compared to 101/68 earlier in the day and 118/78 the day before); her pulse was 74 beats per minute (compared to 106 earlier in the day and 82 the

day before); and her temperature was 97.4 degrees Fahrenheit (compared to 97.5 degrees earlier in the day and 97.6 the day before).

Nurse Mundy left the Jail around 10:00 p.m. As told by Nurse Mundy, before she left, she wrote an approximately one-page handwritten report on Tammy's condition, specifically, "about putting her in the shower and just any behaviors, the way she was acting, anything that was going on[.]" *Id.* at 20:17–19. Nurse Mundy deposited her report in the "doctor's box" in the medical office, *id.* at 39:18, from which Dr. Everson would have retrieved it on his next visit to the Jail, but Dr. Everson never saw Nurse Mundy's report in the box, and discovery has not generated a copy of the document. Nurse Mundy also called Dr. Everson around the same time and communicated the same or similar information as was contained in her written report, but Dr. Everson could not later recall Nurse Mundy's call.

Also around 10:00 p.m., Tammy was again moved to a different cell, from the cell in the medical section to a cell in the receiving area. As no nurses or doctors worked the Jail's night shift, and Nurse Mundy left at 10:00 p.m., there would have been no Jail staff in the medical section to observe Tammy. Three Jail officers, one of whom was the designated medical officer, moved Tammy to her new cell. About halfway through the walk, Tammy "just stopped in the middle of the hallway [between the medical and receiving areas] and went to her knees[,]" saying she could not continue on. Dkt. 96 Ex. 22 (Finley Dep.) 11:13–14. The medical officer who witnessed Tammy's collapse thought it "possibl[y]" "indicate[d] that there might [have been] some issue with [Tammy] that need[ed] . . . heightened scrutiny or heightened supervision . . . [,]" *id.* at

15:5–9, and that it was therefore an event that he would have communicated to the next shift's medical officer.[10]

## V. Tammy's Final Hours: 12:00 a.m. to 2:45 a.m., October 1, 2015

J. Smith and Anthis, a Jail officer, started their shifts at 12:00 a.m. on October 1, 2015. As had been the case the night before, J. Smith was responsible for supervising the shift. The departing shift supervisor whom J. Smith relieved communicated to him that Tammy was withdrawing from heroin and that, earlier in the day, the doctor had ordered her vital signs to be taken every eight hours, next at 4:00 a.m. A notice posted outside Tammy's cell informed observers that she was withdrawing from heroin.

Around 12:45 a.m., Tammy asked for a shower. As one on-duty Jail officer observed, Tammy "had been puking and soiling herself the past couple of days, so this was normal." Dkt. 96 Ex. 11 (Senteney Rep.), at 8; Dkt. 96 Ex. 19 (J. Smith Dep.) 11:14–15 ("Every time [Tammy] would soil herself we would give her a shower[.]"). Around 1:30 a.m., J. Smith and Anthis arrived at Tammy's cell to take her to the showers. Tammy had vomited in her cell or in the trash can, had urinated in her clothes, and may have defecated either in the cell or in her clothes. Once in the shower, Tammy "sat down . . . just letting the water run on top of her. There was one point that she even laid [*sic*] on her side letting the water run on her." Dkt. 96 Ex. 24 (Anthis Dep.) 10:24–11:1.

---

[10] The medical officer left around 10:00 p.m., however, just after Tammy had been moved, and the officer who took his place as the designated medical officer from 10:00 p.m. to 12:00 a.m., when the next shift started, had also helped move Tammy to the cell in the receiving area and had witnessed her collapse in the hallway. The departing medical officer therefore saw no need to communicate to his replacement what both men had each already observed.

First Anthis, and then Anthis and J. Smith, struggled to get Tammy to finish her shower and leave. Eventually Tammy got up from the shower floor but was unable to leave the shower room. "When [Anthis] said, 'Tammy,' she said, 'Huh?' And then she asked [Anthis] if [Anthis] would help put her [clothes] on and [Anthis] told her no[.]" *Id.* at 12:2–4. Tammy put on her Jail-issued jumpsuit but could not fasten it completely from her waist up. J. Smith attempted to physically hoist Tammy out of the shower room, but Tammy was "dead weight" on the shower room floor. Dkt. 96 Ex. 19 (J. Smith Dep.) 15:13.

Eventually Tammy moved herself from the shower room into the hallway between the showers and the receiving area, but could not continue ambulating very far. Tammy stopped, again went to the floor, and lay down on it. Again Anthis and J. Smith attempted to get Tammy up. Anthis could not later recall whether Tammy appeared to understand the commands Anthis and J. Smith were giving her. Anthis asked J. Smith whether they ought to take Tammy's vital signs. It was now around 2:00 a.m.; J. Smith replied that the doctor had ordered her vital signs taken at 4:00 a.m. and they would not be taken sooner. Finally, Tammy was able to move herself the rest of the distance to her cell.

The showers were located close to the receiving area and, from inside her cell, McLaughlin could hear commotion in the hallway:

> I heard two guards screaming, a male and a female screaming saying, "Tammy, get up." And I heard them say—I heard—the male was really rude. . . . I heard him screaming the F-word at her. I heard the girl say, "Cover yourself, that's indecent, we don't want to see your boob," or something like that. I heard him say, "Tammy, fucking get up, get up," like she was a dog. And then I heard Tammy go, "Huh," and then

> I heard dead silence. And about—then I heard the girl say to the guy, "Are you sure all she was withdrawing from is heroin?" I heard him say, "I don't know, that's what they said," or something and they started arguing and screaming at each other. . . . I don't know [what they were saying to one another], it was just they were yelling at each other.

Dkt. 96 Ex. 8 (McLaughlin Dep.) 55:10–56:8.

A video camera inside Tammy's cell recorded her final moments. Dkt. 96 Ex. 21 (J. Smith. Aff. Ex. 3) (manual filing). A reasonable trier of fact could conclude from that footage the following: At 2:02 a.m., Tammy stumbled into her cell and lay down on her back on the cell floor; her jumpsuit was unfastened from the waist up, with breasts exposed. A trash can was tossed into the cell after her. Anthis entered the cell and stood the trash can up as Tammy brought herself to her knees and appeared to address Anthis. Tammy stood up and lay face down on her bunk; Anthis placed the trash can next to her and left. Tammy squirmed and writhed on her bed for several minutes, sometimes clutching at the trash can. She moved from the bed to the toilet, where she sat, still clothed, doubled over. She rose from the toilet and staggered back to her bunk. She continued to squirm restlessly, turning from her side to her stomach and back again. By 2:13 a.m., Tammy was lying on her back; her movements had become fewer and less agitated. By 2:15 a.m., Tammy appeared nearly motionless. At 2:24 a.m., Tammy moved her hands from her head to her chest. She did not move again.

Around 2:45 a.m., officers of the local police department arrived at the Jail having in custody a recent arrestee. One of the officers knew Tammy and saw the notice posted outside her cell that she was inside withdrawing from heroin. The officer looked through

the cell door window and notified Jail staff that Tammy did not appear to be breathing. Jail staff entered the cell and attempted, fruitlessly, to revive Tammy. Tammy's cause of death was identified as "cardiac dysrhythmia due to an electrolyte/hormone deficiency because of her congenital adrenal hyperplasia." Dkt. 96 Ex. 4 (Sozio Rep.), at 2.

## VI. The Instant Motions

This lawsuit was filed on March 22, 2016. Dkt. 1. The now operative *Second Amended Complaint* was filed on September 19, 2016. Dkt. 54. The Estate has brought Eighth Amendment claims under 42 U.S.C § 1983 and negligence claims under state law. The Estate seeks to hold all the Morgan County Defendants (with the exception of the Sheriff) personally liable for violations of the Eighth Amendment relative to their conduct in response to Tammy's medical conditions and her death while incarcerated in the Jail. The Estate seeks to hold the Sheriff vicariously liable both for the constitutional torts of his employees and for the state-law medical negligence of Dr. Everson, the Jail doctor. The Estate seeks to hold ACH vicariously liable both for Dr. Everson's constitutional torts and his state-law medical negligence. Finally, the Estate seeks to hold Dr. Everson personally liable for a violation of the Eighth Amendment and for state-law medical negligence.[11]

The instant motions for summary judgment have been fully briefed and are ripe for decision. As noted above, the Morgan County Defendants seek summary judgment on

---

[11] It does not appear from the summary judgment record or the docket whether the requirements of the Indiana Medical Malpractice Act have relevance to any of the claims at bar. As this issue is not jurisdictional under federal law, *Tacket v. Gen. Motors Corp., Delco Remy Div.*, 93 F.3d 332, 334 (7th Cir. 1996), we inquire no further.

all the Estate's claims, and the ACH defendants on the Estate's federal claims only. The Estate concedes that six of the Morgan County Defendants are entitled to judgment in their favor. Remaining defendants, therefore, are as follows: of the ACH Defendants, ACH and Dr. Everson; and, of the Morgan County Defendants, Nurse Burnam, Nurse Mundy, medical officers Anderson and Moore, and Jail officers Anthis, Schwab, and J. Smith.

## Standard of Decision

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## Analysis

The Estate advances its Eighth Amendment claims under Section 1983 against both the ACH and the Morgan County Defendants. Pl.'s Second Am. Compl. (Dkt. 54) ¶ 91. Its state-law negligence claims run against the ACH Defendants and the Sheriff only. *Id.* ¶ 92. We take up the Estate's Eighth Amendment claims before turning to its state-law claims.

## I. Section 1983: Eighth Amendment

"Section 1983 imposes liability on every official who 'subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution . . . .'" *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (quoting 42 U.S.C. § 1983) (emphasis omitted). To recover under Section 1983, the Estate must show the deprivation of a constitutional right caused by a defendant acting under color of state law. *Wilson v. Warren Cnty.*, 830 F.3d 464, 468 (7th Cir. 2016).

In any Section 1983 action, however, qualified immunity shields state officials from the burdens of suit "insofar as their conduct d[id] not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The basic question is whether the state of the law at the time that [defendant officials] acted gave [them] reasonable notice that [their] actions violated the Constitution[,]" *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) in other words, whether the officials' conduct was "objective[ly] legal[ly] reasonable[] . . . ." *Elyea*, 631 F.3d at 858 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). The individual Morgan County Defendants' defense of qualified immunity, Defs.' Br. Supp. Mot. Summ. J. 28, will be considered as necessary relative to each defendant. (Dr. Everson has not raised qualified immunity, as indeed he cannot. *Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016)).

The Eighth Amendment, as incorporated against the states by the Fourteenth Amendment, protects persons under sentence against cruel and unusual punishments.

U.S. Const. amend. VIII, cl. 3; *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010). This protection embraces a prohibition on "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). A jail official's "deliberate indifference to serious medical needs" of inmates violates the prohibition. *Id.* at 104.

"A successful deliberate indifference claim is comprised of both an objective and a subjective element." *Elyea*, 631 F.3d at 857 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). First, the inmate's medical need must be objectively "sufficiently serious." *Id.* An objectively sufficiently serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Second, jail officials to be found liable must have acted with a "sufficiently culpable" subjective state of mind. *Id.* (quoting *Farmer*, 511 U.S. at 834). A jail official's state of mind is sufficiently culpable when he or she "know[s] of and disregard[s] an excessive risk to inmate health[.]" *Id.* That is, jail officials must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to the inmate] exists" and actually "draw the inference[,]" but disregard the risk nevertheless. *Id.* (quoting *Farmer*, 511 U.S. at 837). "Whether a [jail] official was subjectively aware of a risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a [jail]

official knew of a substantial risk from the very fact that the risk was obvious.'" *Zaya*, 836 F.3d at 805 (quoting *Farmer*, 511 U.S. at 842).

### A. Objectively Serious Medical Need

Neither the Morgan County Defendants nor the ACH Defendants seriously contest that Tammy's medical needs were objectively serious. Defs.' Br. Supp. Mot. Summ. J. (Dkt. 85) 20–21; Defs.' Br. Supp. Mot. Partial Summ. J. (Dkt. 88) 17. That consensus is well taken. Tammy's congenital adrenal hyperplasia was diagnosed by physicians as requiring treatment from the time of its diagnosis in Tammy's infancy; Dr. Everson recognized the need to treat Tammy's heroin withdrawal; and Tammy's sustained vomiting and diarrhea so obviously required treatment that even McLaughlin and Rose, as bystanders and laypersons, perceived the need for it. *See Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("vomiting continuously for a long period of time" may rise to "objectively serious medical condition"); *Greeno*, 414 F.3d at 653 ("[A] lay person would recognize the need for a doctor's care to treat severe heartburn and frequent vomiting.").

### B. Subjective Deliberate Indifference

Both groups of defendants, however, deny that a reasonable trier of fact could find their respective states of mind to be sufficiently culpable based on the record before us to result in their being found liable. On this issue of subjective deliberate indifference, we address each defendant in turn, beginning with the ACH Defendants.

#### 1. The ACH Defendants

##### a. ACH

Under the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a substate actor (usually referred to as a municipality in this context) may be held liable under Section 1983 for constitutional deprivations caused by its municipal policies. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 791 (7th Cir. 2014) (citing *Monell*, 436 U.S. at 694). A municipality may not be held vicariously liable for the constitutional torts of its employees under the doctrine of *respondeat superior*. *Id.* (citing *Monell*, 436 U.S. at 663 n.7). The Seventh Circuit has extended *Monell*'s protection from vicarious liability to private corporate contractors providing essential public services. *Id.* (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

The Estate seeks to hold ACH, a private corporation providing an essential public service under its contract with the Jail, vicariously liable for the deliberate indifference of its employee Dr. Everson. As the Estate recognizes, under current Seventh Circuit law, it may not succeed on this theory of relief. *Id.* And the Estate "concedes that [it] has insufficient evidence of an ACH policy" to present a triable *Monell* issue. Pl.'s Resp. Br. Opp. 46. Accordingly, ACH is entitled to judgment on the Estate's Eighth Amendment claim, and the ACH Defendants' motion is granted to that extent.

b. Dr. Everson, Jail Doctor

"A medical professional . . . may be held to have displayed deliberate indifference only if 'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Sain v. Wood*, 512

F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Zaya*, 836 F.3d at 805.

But the mere provision of "some treatment" by a jail doctor does not, as a matter of law, defeat a charge of deliberate indifference. *Id.*

> Although . . . neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference, . . . "a prisoner is not required to show that [s]he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). . . . [The argument that an inmate's Eighth Amendment] claim fails because [s]he received *some* treatment overlooks the possibility that the treatment [she] did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' [her] condition. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (internal quotations omitted).

*Greeno*, 414 F.3d at 653–54 (other citations omitted).

"[A] doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference" rather than an exercise of professional judgment. *Berry*, 604 F.3d at 441 (quoting *Estelle*, 429 U.S. 97, 104 n.10). Similarly, "failure to consider an individual inmate's condition in making treatment decisions is . . . precisely the kind of conduct that constitutes a 'substantial departure from accepted professional judgment . . . such as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Elyea*, 631 F.3d at 862–63 (quoting *Sain*, 512 F.3d at 895) (alterations omitted).

Moreover, the mere invocation of professional judgment "does *not* mean that a defendant automatically escapes liability . . . ." *Zaya*, 836 F.3d at 805. Nor does the mere existence of possible legitimate explanations for a medical professional's conduct *per se* entitle the medical professional to summary judgment. *Greeno*, 414 F.3d at 654; *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004). Rather, "[w]hen the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya*, 836 F.3d at 805 (citing *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (*en banc*) ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it.")). In short, "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to [the] risk of the harm that they caused." *Petties*, 836 F.3d at 731.

From the record before us, we hold that a reasonable trier of fact could find the following: Dr. Everson knew that Tammy was on dexamethasone. Dkt. 96 Ex. 16 (Everson Dep.) 10:2–3. Dr. Everson did not know why Tammy was on dexamethasone. *Id.* at 10:10. Dr. Everson knew that dexamethasone had a range of uses, from acute treatment of a relatively innocuous condition, like poison ivy, to chronic treatment of a relatively serious condition, like congenital adrenal hyperplasia. *Id.* at 11:13–18; *also id.* at 13:20–23 ("It affects glucose metabolism . . . . It has anti-inflammatory properties, has various effects on the cardiovascular system."). Dr. Everson approved dispensing

Tammy's dexamethasone at the same dosage, while not knowing what the dexamethasone was for. *Id.* at 14:7–8.

Dr. Everson knew that, when a patient's body is subjected to increased stress such as the stress of heroin withdrawal, whether the patient's dexamethasone dosage should be increased in response "depend[s] on specifically what the underlying problem is" for which the dexamethasone has been prescribed. *Id.* at 37:18–23. Due to Tammy's vomiting, Dr. Everson did not know how much dexamethasone was being absorbed. *Id.* at 38:7–8. Dr. Everson did know that, although heroin withdrawal, while highly unpleasant, is not usually dangerous to the withdrawing patient, "an underlying chronic condition" may "possibl[y]" or "reasonabl[y]" increase the risk of death to the withdrawing patient. *Id.* at 25:8–17.

At the time of Dr. Everson's examination of Tammy, Tammy "looked really, really bad. . . . That's when her eyes were sunken down in the back of her head, everything." Dkt. 96 Ex. 8 (McLaughlin Dep.) 49:13–16. Tammy was "white as a ghost[,]" *id.* at 50:25, and looked "so dehydrated that [even a layperson like McLaughlin would think] she was going to have a heart attack." *Id.* at 65:17–18. Tammy "look[ed] like she ha[d] lost 20 pounds, it [was] very apparent. She [was] mumbling, she [could] barely speak . . . ." *Id.* at 40:22–41:1. Tammy was "in a weak state" and obviously needed medical attention. Dkt. 86 Ex. 13 (Mullikin Dep.) 6:25.

Though both Tammy and Nurse Burnam thought Tammy was dehydrated, Dkt. 86 Ex. 8 (Burnam Aff. Ex. 3), at 9; Dkt. 96 Ex. 13 (Burnam Dep.) 17:18–19, and hours of continuous vomiting would obviously produce that result, Dr. Everson discounted that

possibility after touching the inside of Tammy's mouth—an obviously superficial, ineffectual diagnostic method in a vomiting patient such as no minimally competent physician would employ. Dkt. 96 Ex. 3 (Schnall Dep.) 52:4–8 ("She's vomiting. What do you expect her mucus membranes to look like? He puts his hand in her mouth and it's wet. Well, if I vomit, your hand is wet. That's no way to check for dehydration in a person that's been vomiting."); *compare* Dkt. 86 Ex. 4 (Burnam Dep.) 13:22–23 (Burnam applied skin turgor test to assess dehydration). Tammy's pulse was "significantly elevated" at 106 beats per minute, Dkt. 96 Ex. 3 (Schnall Dep.) 51:14–16, and her blood pressure was falling.

"[A]ny reasonable physician should know that a patient with this kind of history and that kind of presentation is in immediate danger[,]" *id.* at 81:15–18, that Tammy "had a life-threatening medical condition, and that the consequences of not treating that condition in a timely fashion created a significant risk to [Tammy's] health and life." Dkt. 96 Ex. 2 (Schnall Rep.), at 5. As a trained and licensed physician, Dr. Everson knew these things. But when Tammy asked to go the hospital, Dr. Everson decided not to send her there. Dkt. 96 Ex. 12 (Anderson dep.) 12:24, 13:1–2.

On this basis, we conclude that a triable issue of fact exists as to Dr. Everson's state of mind in his treatment of Tammy on September 30, 2015. A reasonable jury could conclude that, prior even to examining Tammy, Dr. Everson "presumed" that Tammy's medical needs were entirely encompassed by an ordinary, uncomplicated case of heroin withdrawal, Dkt. 86 Ex. 5 (Everson Dep.) 14:25, and suited a course of treatment to that presumption in the face of obvious and compelling evidence suggesting otherwise, and a

serious risk of death to Tammy should Dr. Everson's presumption prove erroneous. *See* Dkt. 96 Ex. 3 (Schnall Dep.) 55:8–12 ("You've got it backwards. You don't reach the conclusion until you examine the patient appropriately. If [Dr. Everson] reached that conclusion [that Tammy was only withdrawing from heroin] before he looked for [other symptoms of heroin withdrawal or considered other causes of Tammy's symptoms], he was doing a poor job."). In other words, a reasonable jury could conclude that Dr. Everson selected "the 'easier and less efficacious treatment' for an objectively serious medical condition," which "amount[ed] to deliberate indifference" rather than an exercise of professional judgment. *Berry*, 604 F.3d at 441 (quoting *Estelle*, 429 U.S. at 104 n.10).

A reasonable jury could also find that Dr. Everson's failure to determine the reason Tammy was on dexamethasone was a "failure to consider an individual inmate's condition in making treatment decisions" and thus "precisely the kind of conduct that constitutes a 'substantial departure from accepted professional judgment . . . such as to demonstrate that [Dr. Everson] actually did not base the decision on such judgment.'" *Elyea*, 631 F.3d at 862–63 (quoting *Sain*, 512 F.3d at 895) (alterations omitted). In other words, a reasonable jury could conclude that Dr. Everson did not *choose* not to inquire into the nature of Tammy's underlying medical condition necessitating her dexamethasone as a matter of professional judgment, nor did he *choose* to continue her on the same dexamethasone dosage as a matter of the same. Rather, a reasonable jury could conclude that Dr. Everson exercised simply no judgment at all, and was thus deliberately indifferent to the consequences for Tammy's health. *Compare Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (quoting *Snipes*, 95 F.3d at 591) ("What we

have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner.").

A reasonable jury could conclude further that Dr. Everson's continuing to order oral administration of her medications, including her antinausea medication, was a "dogged[] persist[ing] in a course of treatment known to be ineffective" in the face of Tammy's continuous vomiting, and thus deliberately indifferent. *Greeno*, 414 F.3d at 655. A reasonable jury could conclude the same with respect to Dr. Everson's refusal to send Tammy to the hospital for the administration of intravenous fluids in the face of Tammy's obvious dehydration, as evinced in part by Dr. Everson's application of the obviously ineffective diagnostic method of touching Tammy's vomit- or bile-soaked oral cavity mucus membranes. A reasonable jury could find further evidentiary support in the fact that Sheryl, as a bystander and layperson, saw the need to take Tammy to the hospital whenever Tammy had been vomiting for more than three or four hours, and that the physicians there "in every instance" treated Tammy "with either IV fluids or with anti-nausea medication in an other-than-oral route." Dkt. 96 Ex. 3 (Schnall Dep.) 47:21–22, 44:18–20.

Dr. Everson as well as his expert witnesses, of course, tell a different story, asserting that, so far from being deliberately indifferent to Tammy, Dr. Everson's treatment was, in fact, within the appropriate standard of care. A jury may ultimately find Dr. Everson's experts more credible than the Estate's, but that is not for this Court to decide on a motion for summary judgment. Contrary to Dr. Everson's argument, that fact does not entitle him *per se* to judgment, just as the existence of possible legitimate

explanations for a medical professional's conduct does not entitle him *per se* to judgment. *Greeno*, 414 F.3d at 654; *Gil*, 381 F.3d at 663.

Because a reasonable jury could find that Dr. Everson was deliberately indifferent to Tammy's objectively serious medical needs, the ACH Defendants' motion is denied as to that claim.

### 2. The Morgan County Defendants

#### a. Jail Nurse Burnam

"Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry*, 604 F.3d at 443. Further, a jury may find a nurse's deference to a physician's judgment "less justifiable than usual" if the nurse is aware of facts suggesting that deference is inappropriate. *Id.* (analyzing "a case of dental pain rather than a medical problem clearly within [defendant doctor's] professional expertise").

On the record before us, we hold that a reasonable trier of fact could find the following: From speaking with Sheryl on September 28, 2015, Nurse Burnam knew why Tammy was on dexamethasone and why it was imperative that she be continued on it in an appropriate dosage. Dkt. 86 Ex. 1 (Sheryl Dep.) 185:21–24; Dkt. 86 Ex. 10 (Anderson Dep.) 9:22–24. At the time Nurse Burnam examined Tammy on September 29, 2015, from Tammy's general appearance and verbal incoherence, "it was very apparent [Tammy] needed to go to the hospital . . . [,]" Dkt. 96 Ex. 8 (McLaughlin Dep.) 25:2–13. But, when Nurse Burnam spoke to Dr. Everson by phone on September 29, 2015, she

disclosed to him neither Tammy's congenital adrenal hyperplasia, nor how apparent it was that Tammy required further treatment.

After examining Tammy on September 28, 2015, Nurse Burnam decided, or at minimum knew, that any follow-up was to be at the "inmate's request[,]" or, in other words, "[i]f Tammy felt like she was getting worse, she was to let [Jail staff] know." Dkt. 86 Ex. 4 (Burnam Dep.) 14:16, 14:21–22. Nurse Burnam decided, or at minimum knew, that there was no "plan to determine whether once [Tammy] took [the withdrawal protocol medications] and . . . if she was still vomiting whether she would be able to keep [the medications] down[,]" *id.* at 15:11–14, though Nurse Burnam understood that the medications would not have had "any [e]ffect" on Tammy if she were unable to keep them down. *Id.* at 15:16.

When Nurse Burnam administered Tammy's dexamethasone around 8:00 a.m., September 30, 2015, Tammy had just passed through a night of near constant vomiting and diarrhea; along with her fellow inmates, had been "begging for help . . . loud enough" for Jail staff to hear, Dkt. 96 Ex. 8 (McLaughlin Dep.) 36:23–37:1; and had been "left . . . in her cell for hours in jail clothing drenched in her own vomit and feces." Dkt. 96 Ex. 9 (Rose Aff.) ¶ 16. Tammy's "eyes [had] start[ed] to sink back into her head, she look[ed] like she ha[d] lost 20 pounds . . . . [S]he [could] barely speak . . . ." Dkt. 96 Ex. 8 (McLaughlin Dep.) 40:22–41:1. Tammy's fellow inmates were pointing out to Jail staff that the medications administered to Tammy were obviously ineffective and were immediately regurgitated when administered. *Id.* at 49:3–5. Though Nurse Burnam had decided, or at minimum knew, that it was Tammy's burden to inform Jail staff if her

condition worsened, and had decided, or at minimum knew, that there was no mechanism for determining whether Tammy's medications were being absorbed in therapeutic amounts, Nurse Burnam made no response to Tammy's obvious distress, neither immediately informing Dr. Everson, nor further examining Tammy, nor calling for additional medical attention.

When Nurse Burnam was present at Tammy's examination by Dr. Everson on September 30, 2015, Nurse Burnam did not inform Dr. Everson of Tammy's congenital adrenal hyperplasia, nor of the pitiful conditions she had witnessed in Tammy's cell earlier that morning.

In this light, we conclude that a triable issue of fact exists as to Nurse Burnam's state of mind in her treatment of Tammy on September 29 and 30, 2015. Though Nurse Burnam rests her defense on her professional deference to Dr. Everson's instructions on those days, a jury could conclude that Nurse Burnam was not entitled to rely on those instructions where Nurse Burnam knew that those instructions had been rendered in ignorance of a crucial piece of information: Tammy's adrenal hyperplasia. *Berry*, 604 F.3d at 443 (jury may find nurse's deference to physician "less justifiable than usual" if aware of facts suggesting deference inappropriate). Moreover, a jury could conclude that, when Tammy attempted to "follow up" with Jail medical staff as instructed by Nurse Burnam, Nurse Burnam deliberately ignored Tammy's attempts, though knowing that Tammy's complaints were the only avenue for such follow-up. Finally, a jury could conclude that Nurse Burnam's continuing oral administration of Tammy's medication, her failure to report to Dr. Everson Tammy's inability to keep her medication down, and

her failure to call for or suggest care for Tammy given her extreme distress was "blind and unthinking" deference to Dr. Everson, when it was apparent even to laypersons that Tammy's treatment was wholly ineffective. *Berry*, 604 F.3d at 443; *also id.* at 442 ("[Defendant doctor's] 'obdurate refusal to alter [plaintiff's] course of treatment despite [her] repeated reports that the medication was not working and [her] condition was getting worse' is sufficient to defeat [defendant's] motion for summary judgment.") (quoting *Greeno*, 414 F.3d at 654).

In light of the above, Nurse Burnam is also not entitled to the protections of qualified immunity at the summary judgment stage. "As a general proposition, *Farmer* . . . established the modern standard for deliberate indifference long ago, and before that it was not remotely controversial that jailers owed inmates a duty to provide adequate and timely medical treatment." *Bradley v. Sheriff*, No. 4:12-cv-4008, 2016 WL 9775233, at *10 (C.D. Ill. Mar. 2, 2016) (citing *Estelle*, 429 U.S. at 104–05). That a nurse's justifiable deference to a physician is not unlimited was established in this circuit no later than 2010. *Berry*, 604 F.3d at 443. That an inmate's in-custody death, preceded by wholly ineffective treatment of vomiting and dehydration due to heroin withdrawal, in turn aggravating a serious underlying medical condition, could give rise to Eighth Amendment liability for a defendant who knew of and disregarded those circumstances, was also established no later than 2010. *Gayton*, 593 F.3d at 613–15. In short, if a jury finds that Nurse Burnam knew that the course of treatment Dr. Everson directed, and in which she persisted, was inadequate to meet Tammy's serious medical needs, "such

conduct violates clearly established law under the Eighth Amendment." *Petties*, 836 F.3d at 734.

For these reasons, a reasonable jury could find that Nurse Burnam was deliberately indifferent to Tammy's objectively serious medical needs. The Morgan County Defendants' motion is therefore denied as to this claim.

### b. Jail Nurse Mundy

On the record before us, a reasonable trier of fact could find the following: On the evenings of September 29 and 30, 2015, when she was on duty at the Jail until approximately 10:00 p.m., Nurse Mundy witnessed Tammy's extreme distress as recounted by McLaughlin and Rose. Specifically, when Nurse Mundy delivered Tammy's antinausea medications around 8:00 p.m. on September 29, 2015, and made a second medical pass later the same evening, Tammy and her fellow inmates pleaded with Nurse Mundy to have Tammy taken to the hospital and communicated to Nurse Mundy Tammy's inability to hold down any fluids or medication. But Nurse Mundy thought that Tammy, as a drug-addicted inmate, "d[id]n't really deserve any treatment or help . . . ." Dkt. 96 Ex. 8 (McLaughlin Dep.) 34:9. With "worse than cold" "disdain[,]" *id.* at 34:15, 34:19, Nurse Mundy dismissively offered Tammy only over-the-counter Pepto-Bismol, knowing this would be immediately regurgitated and therefore wholly ineffective.

When Nurse Mundy saw Tammy on September 30, 2015, Nurse Mundy observed that Tammy had been vomiting, but had not eaten (as Tammy's vomit contained no solid food) and had little liquid left in her system to regurgitate, as she had only been "spitting up stomach bile" or was suffering "dry heave[s.]" Dkt. 96 Ex. 17 (Mundy Dep.) 42:16–

18, 43:3. Tammy's clothes were soiled, her blood pressure was dropping, and her heart rate was fluctuating.

Though a somewhat closer question than Nurse Burnam's potential liability, we conclude that a triable issue of fact exists as to Nurse Mundy's state of mind in her treatment of Tammy on September 29 and 30, 2015. Unlike Nurse Burnam, no evidence appears in the record as would support a finding that Nurse Mundy knew of Tammy's adrenal hyperplasia. Nevertheless, a jury could conclude that Nurse Mundy, like Nurse Burnam, had observed Tammy's deteriorating plight, and had been told by Tammy and her fellow inmates that Dr. Everson's prescribed course of treatment was ineffective and that Tammy required a more extreme intervention. *See Berry*, 604 F.3d at 443 ("[Defendant nurse] was aware of [plaintiff's] ongoing [tooth] pain and the ineffectiveness of the recommended pain medications, yet [the nurse] apparently never consulted [the prison doctor] again regarding whether a dentist's examination was necessary."). Moreover, unlike Nurse Burnam, a jury could base a finding of Nurse Mundy's deliberate indifference on direct evidence of her state of mind: that Nurse Mundy had been contemptuous of Tammy, only slightly valuing her health and life.

It is true that Nurse Mundy claims to have left a written report for Dr. Everson before she left the Jail on September 30, 2015, and also claims to have called him around the same time to inform him of Tammy's condition. A jury could credit this evidence and perhaps deem Nuse Mundy's constitutional obligations discharged. But, as the report itself has never been located, a jury could also conclude that Nurse Mundy did not actually prepare and leave the report, or, if she did, that leaving a report which Nurse

Mundy knew Dr. Everson would not see until one week later did not purge, and may indeed evince, Nurse Mundy's deliberate indifference to Tammy's condition on September 30, 2015. As to Nurse Mundy's phone call, as Dr. Everson claims not to have received it, and as Dr. Everson claims further that he would have expected Jail staff to inform him of such severe symptoms as a jury could determine Tammy presented on the evening of September 30, 2015, and that he would have suggested further evaluation and treatment had he been so informed, Dkt. 96 Ex. 16 (Everson Dep.) 41:1–43:25, a jury could also conclude that Nurse Mundy never actually made the phone call, or, if she did, that she did not accurately communicate Tammy's symptoms.

Finally, for the reasons explained in our analysis of Nurse Burnam's potential liability, if a jury finds that Nurse Mundy knew that the course of treatment Dr. Everson directed, and in which she persisted, was inadequate to meet Tammy's serious medical needs, "such conduct violates clearly established law under the Eighth Amendment." *Petties*, 836 F.3d at 734.

For these reasons, a reasonable jury could find that Nurse Mundy was deliberately indifferent to Tammy's objectively serious medical needs. The Morgan County Defendants' motion is therefore denied as to this claim.

### c. Jail Medical Officer Anderson

"'[I]f [an inmate] is under the care of medical experts, a non-medical [jail] official[12] will generally be justified in believing that the [inmate] is in capable hands. . . .'

---

[12] Though Anderson's title was "medical officer," the record discloses that a Jail medical officer was effectively an ordinary Jail officer whose duties were to assist nurses and doctors as needed.

However, 'nonmedical officials can be chargeable with deliberate indifference where they have a reason to believe (or actual knowledge) that [jail] doctors or their assistants are mistreating (or not treating) [an inmate].' Non-medical defendants cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (quotations and alterations omitted)) (other citations omitted).

With respect to her knowledge of Tammy's condition, a jury could conclude that Anderson was nearly identically situated to Nurse Burnam. A jury could find that Anderson heard Sheryl explain the importance of Tammy's dexamethasone on September 28, 2015, when Sheryl "went into detail about what the issue was" that necessitated the dexamethasone. Dkt. 86 Ex. 10 (Anderson Dep.) 9:22–24. Given Sheryl's knowledge that Tammy "could die of adrenal crisis if her steroid replacement was not maintained adequately[,]" Dkt. 96 Ex. 2 (Schnall Rep.), at 2, as well as the fact that it "was always [Sheryl's] main concern" that Tammy keep her medications down when she was withdrawing from heroin, Dkt. 86 Ex. 1 (Sheryl Dep.) 108:21, a jury could conclude that these were "details" Sheryl communicated to Anderson.

---

While Anderson reported receiving "various medical training from the companies that have contracted to provide medical services at the jail," Dkt. 86 Ex. 9 (Anderson Aff.) ¶ 1, the content of that training is not further explained, and in any event does not appear to have risen to the level as would justify holding Jail medical officers to an expert, rather than lay, standard. *See* Dkt. 96 Ex. 14 (Darling Dep.) 19:9–13 ("A medical officer is just a jail officer, they don't have any additional training other than they just work in the area with the nurse, they assist the nurse with what she needs to do and they pass meds in the morning."). In other words, it does not appear that Jail medical officers possessed any professional medical skill or exercised any medical judgment. We note that the parties have not directly addressed which standard ought to apply to such officers.

But, a jury could conclude, Anderson did not communicate any of what she knew relative to Tammy's dexamethasone or adrenal hyperplasia when she called Dr. Everson on September 28, 2015, to determine whether to administer the medications Sheryl had brought to the Jail; nor on September 29, 2015; nor on September 30, 2015, when Anderson was present with Nurse Burnam for Dr. Everson's examination of Tammy, and would have observed Nurse Burnam's failure to communicate to Dr. Everson what Sheryl had told them two days prior. *Compare Mathison v. Moats*, 812 F.3d 594, 597–98 (7th Cir. 2016) (defendant prison guard "immediately notified his superior [of plaintiff inmate's medical need] . . . .").

Crediting the Estate's evidence, a jury could conclude further, as with Nurse Burnam and Nurse Mundy, that, over the course of September 29, 2015, and September 30, 2015, Anderson had sufficient exposure to Tammy's plight (indeed, Anderson observed Tammy at fifteen- to thirty-minute intervals from 10:00 a.m. to approximately 5:30 p.m. on September 30, 2015. Dkt. 86 Ex. 9 (Anderson Aff. Ex. 3), at 8) and to Tammy's cellmates' pleas on her behalf that her medications were immediately regurgitated and were therefore not therapeutic, so as to be aware of the risks to Tammy from the very fact that they were obvious.

A jury could conclude accordingly that, coupled with Anderson's knowledge of the risks to Tammy as communicated by Sheryl, and with Anderson's knowledge of Dr. Everson's ignorance of Tammy's adrenal hyperplasia, Anderson had "reason to believe (or actual knowledge) that [jail] doctors or their assistants [were] mistreating (or not treating)" Tammy. *Arnett*, 658 F.3d at 755 (quoting *Hayes*, 546 F.3d at 525).

For these reasons, we conclude that a triable issue of fact exists as to Anderson's state of mind in her treatment of Tammy on September 29 and 30, 2015. Moreover, if a jury finds that Anderson knew that the course of treatment Dr. Everson directed, and in which she persisted along with Nurse Burnam, was inadequate to meet Tammy's serious medical needs, "such conduct violates clearly established law under the Eighth Amendment." *Petties*, 836 F.3d at 734. The Morgan County Defendants' motion is therefore denied as to this claim.

### d. Jail Medical Officer Moore

Moore's only contact with Tammy occurred during the two hours, from 10:00 p.m. to 12:00 a.m., on September 30, 2015, when Moore filled in for the evening shift's regularly scheduled medical officer, who had left the Jail early that evening. Moore points out that, regarding his conduct relative to Tammy, the record before us can support, at most, a finding that he was with Tammy that evening when she stopped walking and went to her knees as he helped her move between the medical and receiving areas of the Jail.

The record cannot support a finding that Moore was aware of and disregarded a serious risk to Tammy's health, as there is no evidence that Moore knew more than that Tammy was suffering from heroin withdrawal and no evidence that Moore was exposed to Tammy's condition for long enough a time to justify an inference of knowledge of risk from the very fact the risk was obvious. *Compare Gil*, 381 F.3d at 664 ("[F]acts showing that a defendant has been exposed to information concerning the risk will permit a jury to infer subjective awareness of a substantial risk of serious harm[.]") (citing *Estate of Cole*

*ex rel. Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)). The Estate in its briefing on the instant motion never argues to the contrary. Accordingly, Moore is entitled to judgment, and the Morgan County Defendants' motion is granted to that extent.

### e. Jail Officer Anthis

Where a jail official is only capable of communicating, or only authorized to communicate, an inmate's medical concern to another jail official, such communication ordinarily defeats a charge of deliberate indifference as a matter of law. *See Mathison*, 812 F.3d at 597–98 (defendant prison guard "immediately notified his superior [of plaintiff inmate's medical need] . . . as protocol required; [the guard] had no medical training that would have enabled him to do more for [plaintiff inmate]."); *Berry*, 604 F.3d at 440 (defendant prison administrator consulted with medical staff, forwarded plaintiff inmate's concerns to department of correction, timely responded to plaintiff inmate's complaints).

Though the record may support a finding that Anthis was aware of a serious risk to Tammy's health in the early morning hours of October 1, 2015, it does not support a finding that Anthis disregarded that risk. Crediting the Estate's own evidence, Anthis and J. Smith, her superior and supervisor, engaged in a heated argument over the severity of Tammy's condition and whether her vital signs ought to be taken then, at approximately 2:00 a.m., as opposed to 4:00 a.m., when they were next due to be taken under Dr. Everson's instruction. J. Smith "made the decision" not to measure Tammy's vital signs at 2:00 a.m. Dkt. 96 Ex. 19 (J. Smith Dep.) 18:17. There is no record evidence that Anthis was in a position to countermand her superior's direction or otherwise "do more" for

Tammy. *Mathison*, 812 F.3d at 598. Accordingly, Anthis is entitled to judgment, and the Morgan County Defendants' motion is granted to that extent.

### f. Jail Officer Schwab

As with Moore, we conclude that the record cannot support a finding that Schwab was aware of and disregarded a serious risk to Tammy's health. Schwab was exposed to Tammy for the duration of the September 30, 2015, night shift, from about 12:00 a.m. to about 8:00 a.m. There is no evidence that Schwab knew of Tammy's adrenal hyperplasia or the potential seriousness of a condition for which dexamethasone is indicated, nor, indeed, any evidence that Schwab knew anything about Tammy's course of treatment at all, as Schwab's time on duty did not coincide with medication administration. There is no evidence that Schwab was in a position to contextualize what she had observed on September 30, 2015, so as to be aware that Tammy's treatment was ineffective for heroin withdrawal.

In other words, while Schwab would have been exposed to Tammy's distress as described by McLaughlin and Rose, there is no evidence that Schwab was aware of enough predicate facts of Tammy's condition so as to draw the inference that Tammy's treatment was "mistreat[ment]" or effectively "no[] treat[ment] . . . ." *Arnett*, 658 F.3d at 755 (quoting *Hayes*, 546 F.3d at 525); *compare Gil*, 381 F.3d at 664 ("[F]acts showing that a defendant has been exposed to information concerning the risk will permit a jury to infer subjective awareness of a substantial risk of serious harm[.]") (citing *Estate of Cole*, 94 F.3d at 260). On this record, though admittedly a close question, we conclude that any

reasonable jury must find that Schwab "was justified in believing" that Tammy was in "capable hands." *Arnett*, 658 F.3d at 755 (quoting *Spruill*, 372 F.3d at 236).

Accordingly, Schwab is entitled to judgment, and the Morgan County Defendants' motion is granted to that extent.

### g. J. Smith, Jail Officer

As with Anthis, and for the same reasons, the record supports a finding that J. Smith was aware of a serious risk to Tammy's health in the early morning hours of October 1, 2015. Both Dr. Everson and one of the Estate's experts believe that, from Tammy's presentation as she was taken from her cell in the receiving area to the showers and back again between 1:30 a.m. and 2:00 a.m., a lay Jail officer would have been expected to examine Tammy further by taking her vital signs or to seek further evaluation from a medical professional. Dkt. 96 Ex. 3 (Schnall Dep.) 107:10–17; Dkt. 96 Ex. 16 (Everson Dep.) 43:10–25. A jury could find that, by that point, Jail staff were generally aware that Tammy "had been puking and soiling herself the past couple of days[.]" Dkt. 96 Ex. 11 (Senteney Rep.) at 8. A jury could find that, at the time Anthis and J. Smith took Tammy for a shower, Tammy was unresponsive, nonverbal, and mere "dead weight . . . ." Dkt. 96 Ex. 19 (J. Smith Dep.) 15:13. Anthis herself, a jury could conclude, saw that Tammy's symptoms indicated a more serious problem than just heroin withdrawal, and felt strongly enough about the danger to Tammy should Anthis and J. Smith fail to do more for Tammy, that Anthis was willing to exchange heated words with her supervisor. Dkt. 96 Ex. 8 (McLaughlin Depo.) 55:10–56:8.

Unlike Anthis's case, however, the record also supports a finding that J. Smith disregarded that risk. J. Smith had "discretion . . . to take [Tammy's] vital signs" at 2:00 a.m. rather than 4:00 a.m., "[o]r to call the doctor and see what to do[.]" Dkt. 96 Ex. 19 (J. Smith Dep.) 18:4–8. Rather than do so, however, as a jury could find, J. Smith personally "made the decision" to wait until 4:00 a.m. for no reason at all other than adherence to a schedule which did not demand adherence. *Id.* at 18:17. Where a great medical need may be investigated or treated at no or slight cost, a claim of deliberate indifference finds support. *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) ("[Plaintiff] was not seeking an expensive or unconventional treatment . . . . The prison guard's deliberate refusal of it was a gratuitous cruelty, and not a trivial one . . . .").

For these reasons, we conclude that a triable issue of fact exists as to J. Smith's state of mind in his conduct relative to Tammy in the early morning of October 1, 2015. Moreover, if a jury finds that J. Smith deliberately refused treatment of Tammy's serious medical needs, such conduct violated Tammy's clearly established Eighth Amendment rights. *Id.* (denying qualified immunity).

### h. The Sheriff

The Estate's claim against the Sheriff in his official capacity is a claim against the office of the Morgan County Sheriff, *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); Pl.'s Second Am. Compl. ¶ 6, which office may be subject to municipal liability for its constitutionally injurious policies under *Monell*, but may not be held vicariously liable for the constitutional torts of its employees, as explained above relative to ACH.

The Estate "concedes that [it] has insufficient evidence of a policy" of the Sheriff to present a triable *Monell* issue. Pl.'s Resp. Br. Opp. 47. Accordingly, the Sheriff is entitled to judgment on the Estate's federal claim, and the Morgan County Defendants' motion is granted to that extent.

## II. State-Law Negligence Causing Death: Sheriff's Immunity from Vicarious Liability

The Estate seeks to hold the Sheriff and ACH vicariously liable for Dr. Everson's tortious acts or omissions in treating Tammy,[13] and to hold Dr. Everson directly liable for the same. *See* Ind. Code § 34-23-1-1 ("When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter[.]"). While the ACH Defendants concede that genuine issues of material fact preclude judgment in their favor on this claim, and therefore do not seek it, Defs.' Br. Supp. Mot. Partial Summ. J. 2, the Sheriff contends that he is immune from vicarious liability in this case. We agree.

In exercising supplemental jurisdiction over state-law claims, a federal court is bound to apply state substantive law as it believes the state's highest court would apply it. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). "If a state's highest

---

[13] The Estate does not appear to advance a vicarious liability claim against the Sheriff for the conduct of any of the Sheriff's own employees, and expressly disclaims any interest in holding the Sheriff's employees personally liable under state law. *See* Pl.'s Resp. Br. Opp. 50 ("The plaintiff advances no claims against the sheriff's employees under state law. Accordingly, that part of the Sheriff's motion [arguing that the Indiana Tort Claims Act immunizes the Sheriff's employees personally] is superfluous.").

court has not ruled on an issue, intermediate appellate court decisions constitute the next best indicia of what state law is." *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (*en banc*) (quoting 19 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. and Proc.* § 4507 (1982)). If the interpretation of state law is still doubtful, "[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path (at least until the [state supreme court] tells us differently)." *Id.*

The Sheriff points out that, as a governmental entity, the Indiana Tort Claims Act, specifically, Subsection 10, Ind. Code § 34-13-3-3, immunizes him from liability where "a loss results from . . . [t]he act or omission of anyone other than the governmental entity or the governmental entity's employee." Ind. Code § 34-13-3-3(10). Here, the Sheriff argues, the Estate seeks to hold the Sheriff liable for the conduct of ACH, an independent contractor, and its employee Dr. Everson—in other words, for the conduct of someone other than the governmental entity or its employee. The Estate responds that the Sheriff has a nondelegable duty to "take care of the county jail and the prisoners there[,]" Ind. Code § 36-2-13-5(a)(7), including "provision of reasonable medical care[,]" *Trout v. Buie*, 653 N.E.2d 1002, 1008 (Ind. Ct. App. 1995), and that the Sheriff cannot contract away his liability for the breach of such duty. *Bagley v. Insight Commc'ns Co.*, 658 N.E.2d 584, 586 (Ind. 1995) ("where the principal is by law . . . charged with performing the specific duty[,]" principal's duty is nondelegable).

In *Bartholomew County v. Johnson*, 995 N.E.2d 666 (Ind. Ct. App. 2013), the Indiana Court of Appeals held that Subsection 10 immunity for the conduct of

independent contractors extends to liability for breach of nondelegable duties. *Id.* at 678–79. Though this "broke from earlier [Court of Appeals] case law that had denied the independent contractor exemption in the case of nondelegable duties[,]" *Wade v. Lain*, No. 2:11-cv-454, 2015 WL 6828851, at *8 (N.D. Ind. Nov. 6, 2015), the *Johnson* court grounded its holding in the Indiana Supreme Court's decision in *Hinshaw v. Board of Commissioners*, 611 N.E.2d 637 (Ind. 1993).

There, following a collision between their car and another at an intersection, plaintiffs alleged that private negligence in operating the other car combined with public negligence in signing and maintaining the intersection. *Hinshaw*, 611 N.E.2d at 638. The county defendant asserted Subsection 10 immunity. *Id.* The state high court rejected that assertion, holding that Subsection 10 does not confer immunity "when the circumstances designated in [Subsection 10] do not encompass or directly relate to the specific government conduct for which liability is sought to be imposed." *Id.* at 640. But, the court noted,

> [t]he law has long recognized a number of circumstances in which tort liability may be vicariously imposed upon persons for the conduct of agents who are not employees or subject to any right of control by the employer. It is in such actions seeking to impose vicarious liability by reason of conduct of third parties that governmental entities and employees may seek to claim immunity under Subsection [10].

*Id.* at 640–41 (citing *inter alia City of Logansport v. Dick*, 70 Ind. 65, 80–81 (1880) (municipal principal with "the imperative duty, which it owed to the public, to keep its streets . . . in a safe condition" may be liable for injury caused by inherently dangerous conduct of independent contractor)) (other citations omitted).

The *Johnson* court held that "[t]he clear import of *Hinshaw*'s vicarious liability analysis is that [Subsection 10] entitles a governmental entity to immunity from liability for a loss resulting from the acts or omissions of an independent contractor[.]" 995 N.E.2d at 678. Because a principal is not ordinarily liable for the conduct of its independent contractor, *id.*, vicarious liability for the governmental entity as principal "would arise only if the independent contractor had performed a non-delegable duty. [Subsection 10] would be useless in situations involving an independent contractor if it did not apply to non-delegable duties, and we 'presume that the legislature did not enact a useless provision.'" *Id.* at 678–79 (quoting *Hinshaw*, 611 N.E.2d at 638) (other citations omitted). The *Johnson* court concluded that, to the extent that earlier Court of Appeals precedent, which did not discuss *Hinshaw*, conflicted with *Hinshaw*, the latter must control. *Id.* at 679.

We agree with the Sheriff that *Johnson* and *Hinshaw* represent the better view of state law on this point.[14] If there is any doubt, a federal court should resolve it in favor of reasonably restricting liability. *Todd*, 21 F.3d at 1412. The Sheriff is immune under Subsection 10 from vicarious liability for the breach of his nondelegable duties by an independent contractor. Accordingly, the Sheriff is immune from vicarious liability for the conduct of ACH and Dr. Everson, and is entitled to summary judgment on the

---

[14] We acknowledge having reached the contrary conclusion in *Johnson v. Anderson*, No. 1:05-cv-421, 2006 WL 2524125, at *4 (S.D. Ind. Aug. 29, 2006) (Barker, J.). Our analysis there did not have the benefit of *Hinshaw*, which, as noted in *Johnson* and *Lain*, was not discussed in the leading Court of Appeals cases on this question at the time.

Estate's state-law claim. The Morgan County Defendants' motion is therefore granted to that extent.

## Conclusion

For the reasons above, we conclude that the ACH Defendants' motion is GRANTED as to ACH and DENIED as to Dr. Everson. The Morgan County Defendants' motion is GRANTED as to Sichting, N. Smith, Andrews, Darling, Martin, and Mullikin; it is further GRANTED as to Moore, Anthis, Schwab, and the Sheriff. The Morgan County Defendants' motion is DENIED as to Nurse Burnam, Nurse Mundy, Anderson, and J. Smith.

IT IS SO ORDERED.

Date:  _____1/29/2018_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Adriana Katzen
BLEEKE DILLON CRANDALL, PC
adriana@bleekedilloncrandall.com

Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Richard A. Waples
WAPLES & HANGER
rwaples@wapleshanger.com